**SOUTHLAND–GREYHOUND LINES, Inc.,
v. COTTEN.**

No. 2193.

Court of Civil Appeals of Texas. Beaumont.

June 30, 1932.

Rehearing Denied Dec. 28, 1932.

H. M. Kinard, of Orange, Barnes & Barnes, of Beaumont, and John H. Awtry, of Dallas, for appellant.

Dies, Stephenson & Dies, of Orange, for appellee.

WALKER, J.

This was a suit by appellee, E. E. Cotten, against appellant, Southland-Greyhound Lines, Inc., for damages for personal injuries to his wife, and for damages to his automobile, resulting from a collision between one of appellant's buses and appellee's sport model Ford coupé, on the Beaumont-Orange Highway in Orange county on the evening of November 9, 1929, between 6 and 7 o'clock. Appellee had with him in his car his wife and young daughter about ten years old, and was driving from Beaumont to Orange. The collision occurred on the west side of Coale's creek, that is, on the Beaumont side, about eight miles from Orange. At this point there was a bridge across the creek, and on the west side of the creek were guard rails for some distance up to the bridge, on both sides of the highway. As appellee approached the bridge, a six-wheel log truck, loaded with logs, was parked on the highway on the west side of the bridge, headed towards Orange. The truck was near the guard rails, with the right wheels off the pavement, bogged down, and the left wheels on the concrete pavement. Immediately behind the truck, also headed towards Orange, was parked a Chevrolet car. This car was parked as near the guard rails as possible, with its right wheels off the pavement and the left wheels on the concrete pavement. It was dark and drizzling rain at the time. As appellee drove up to these parked cars, he saw a car approaching him from towards Orange and, believing that he did not have time to drive around these two parked cars in time to avoid a collision with the approaching car, he brought his car to a stop immediately behind the Chevrolet car. A moment or two after he stopped his car he was hit by appellant's bus, which had been following closely behind him for several miles. Upon trial to a jury appellant was convicted of actionable negligence in (a) driving at a dangerous rate of speed, (b) driving with defective brakes, and (c) driving without keeping a proper lookout. The jury found in appellee's favor on all defensive issues such as contributory negligence, sole proximate cause, etc., and assessed his damages at $30,167.50. From judgment in his favor for that sum the appeal was duly prosecuted to this court.

Appellant asserts that "the overwhelming preponderance of the evidence is contrary to an affirmative finding that the brakes on the bus in question were inadequate." This proposition is overruled. Mr. George A. Foreman, a passenger on the bus at the time of the collision, testified:

"I was sitting in the front. I was acquainted with the driver of the bus. I know his name, it was Norris, J. T. Norris. It was drizzling rain at the time this collision occurred. I have driven cars about fifteen years. I have had occasion to use brakes to bring them to a stop. * * * I saw the car ahead of us when it was brought to a stop, that is the car with which we collided. I saw that car stop. I would judge that car was several hundred yards ahead of us when it was brought to a stop. I would say it was over 100 yards, anyway, ahead of the bus. I state to the jury I was riding in the front part of the bus and saw the car ahead of us with which the bus collided when that car was brought to a stop. The bus driver drove up within a distance of about, I should think 75 feet of the car that was parked, or the car that was stopped ahead of him, and I thought he was going to stop, and he pushed his clutch, I guess it was his clutch in and did not seem to get any response from the car and he pulled his emergency brake, the emergency brake is the brake in the middle of the car, what I would call the emergency brake, and it did not stop the car any, the car just slided right on down and hit the car ahead of it. As he was going into it—after he started to stop and going down to the car, he said, 'I am bound to hit, I am bound to hit them. I am bound to hit them.' He wasn't talking to me any more than he was anyone else. I was in the seat just back of him, looking right over his shoulder. Immediately after the collision occurred I had occasion to examine the brake of that bus. When the collision occurred, I don't know whether all got out of the bus or not, but several did. Mr. Norris did, and so did I, and one or two others, I don't know who they were—he talked to the folks in the car. I walked down and looked at the wreck where the car had hit—where the bus had hit the other car, and I come back to the bus before he did, and I just got in the seat, the driver's seat, and tried the brake to see if it would work, and it did not seem to—it pulled right on up easy, pulled clear on back without any resistance whatever. The driver and I talked about the collision coming in town after the wreck. I said 'Norris, I don't think you are to blame for the accident.' I said 'it is the

fault of the car,' you have got no brakes on the car,' and I said 'If I was you, I would be mighty careful driving from here into Orange.' He says 'I am going to be careful,' something similar to that, that is about what was said."

Since the finding on the issue of defective brakes is sustained by the evidence and is sufficient to support the judgment in appellee's favor, we pretermit a discussion of the propositions, challenging the finding that the speed of the bus was negligent and that the operator of the bus failed to keep a proper lookout at the time of the collision.

■ The jury was given the following definition of "proximate cause" and of certain terms used in the definition:

"You are instructed that the term 'proximate cause,' as that term is used in the following issues, means a moving and efficient cause, without which the injury in question would not have happened; an act or omission becomes a proximate cause of an injury whenever such injury is the natural and probable consequence of the act or omission in question and one that ought to have been foreseen by a person of ordinary care and prudence in the light of attending circumstances. It need not be the sole cause, but it must be a concurring cause, which contributed to the production of the result in question and but for which the said result would not have occurred.

"The term 'moving cause,' as used in the above definition, means that cause which is present and acting in bringing about the result.

"The term 'efficient cause,' as used in the above definition, means simply the working cause, or that cause which produced effects or results."

Error is assigned against this definition on the following grounds: (a) It did not include "the idea of continuous sequence unbroken by an independent cause"; (b) "it reduced proximate cause to a contributing cause, or merely to a concurring cause"; (c) it failed to submit the idea of "new and independent cause." As against these exceptions this definition of "proximate cause" was sustained in West Texas Coaches, Inc., v. Madi (Tex. Civ. App.) 15 S.W.(2d) 170, on authority of Texas & P. Railway Co. v. Bigham, 90 Tex. 223, 38 S. W. 162, and Seale v. Railway Co., 65 Tex. 274, 57 Am. Rep. 602.

■ The trial court's definition of "efficient cause" was taken from Words and Phrases, First Series, vol. 3, p. 2323, on authority of Pullman Palace Co. v. Laack, 143 Ill. 242, 32 N. E. 285, 18 L. R. A. 215, and we think was sufficient to give the jury a reasonably satisfactory understanding of the meaning of the term. In Blanch v. Villiva (Tex. Civ. App.) 22 S.W.(2d) 490, we suggested certain definitions of this term, chosen by us from Words and Phrases, after a careful review of all the definitions cited by this excellent and most comprehensive work. But, though we did not select the definition given in this case, we do not think it should be construed as error.

■ As against the definition of "proximate cause," exceptions were also reserved to the court's refusal to define the term "natural consequence" and "probable consequence." These terms were not separately submitted in the charge, as the exceptions would suggest, but the one term "natural and probable consequence" was used. On authority of Rio Bravo Oil Co. v. Matthews (Tex. Civ. App.) 20 S.W.(2d) 342, we do not think it was error to refuse to define this term. In the case cited we held that "natural and continued sequence" were ordinary words of simple meaning and required no definition. For other authorities in point, see Texas & Southwestern Digest, Trial, ⊜219, where most of the cases on this point are digested.

■■ Though requested by appellant, the trial court refused to submit to the jury the following issues of sole proximate cause: (a) The failure of the driver of the log truck and the driver of the Chevrolet car, as these cars were parked ahead of appellee's Ford coupé, to have proper lights on their cars to warn traffic on the highway; (b) the act of the driver of the log truck and the driver of the Chevrolet car in parking their cars on the highway; (c) the failure of the driver of the log truck and the driver of the Chevrolet car to place signals or post a watchman in front of and in the rear of their cars to warn traffic that their cars were parked on the highway. As grounds of contributory negligence against appellee, the court refused to submit the following issues, requested by appellant: (a) The failure of appellee to have his car properly lighted in the rear; (b) as to whether or not appellee could have driven around the parked cars ahead of him at the time and place in question, and thereby have avoided the collision; and (c) the issue as to whether or not appellee kept a proper lookout for the approach of traffic. These issues were all pleaded by appellant, and by appropriate propositions it is urged that the refusal to submit them to the jury constitutes reversible error. These issues were all properly refused, in that, under the undisputed evidence, they were not raised as fact issues of sole proximate cause or of contributory negligence. The testimony of the driver of the bus fully supports this conclusion. The driver, Mr. J. T. Norris, testified as follows:

"My name is J. T. Norris. In November, 1929, I was driving a bus from Beaumont to Orange. My bus was involved in a collision. * * * It was raining at the time and we approached this bridge here. Several miles back up the road there was a Ford car passed by the bus, and I followed this car for some

distance, and as we approached the bridge at this creek, this car ran up or drove up behind a truck that was parked on the road and stopped, but owing to the fact that there was some very bright lights I did not see the truck —I couldn't see the truck, and at the time I saw the Ford stop, it stopped very suddenly in front of me, driving a heavy bus, and I couldn't stop, and eased it into the back end of the Ford. There was a car coming from the opposite direction, I say. The cars— there was several cars approaching at that time, that is, I passed a car just before and then another one about the time I got to it, there were some very bright lights, very blinding lights ahead. * * * I was about 50 or 75 yards from the car I ran into before I was blinded by the lights. When I came out of the blinding lights so I could see there I was I judge around 50 or 60 feet, around 50 ft. from it. I did not see the Cotten's car stop light flash through the headlights of those cars. I did not see any stop light at any time. * * * If I had known that the Cotten car had stopped when it was at fifty or seventy-five yards ahead of me, I could have had time to have stopped, and would have been in position to have stopped. I did not see any sign of the car stopping when it was fifty or seventy-five yards from me. I was following it, as I went into the light, just like I had been following it all the way from Beaumont, after I come out of it the car was stopped. In other words it seemed to me like the car just stopped. When I come out of the light, it was standing there stopped.

" * * * On the day this collision occurred, I was following Mr. Cotten. That is, he had passed me back up the road. I had been following him several miles. I could say it was over two miles. I really did not know. Like I say, several miles. I had been trailing him several miles. I was driving about 50 or 75 yards, may have been from that to 200 yards, just driving on what I consider a safe distance. I don't know. I may have been a little closer at times and a little further at times. At this particular time I had been driving about twenty-five miles an hour. I believe I was approaching a bend at the time this collision occurred, slight bend. There is a bend in the road. I don't know, some people call it a sharp bend, some don't. It is not so sharp. I tell the jury I was 50 or 75 yards and trailing Mr. Cotten at the time he stopped his car, and I have stated at the time he stopped his car I was looking straight ahead. I did not say I saw him when he brought his car to a stop. I said I saw the car, looked like it was practically stopped. There was a bright light come up, I was following him, and when I come out of this light this car was suddenly stopped. I had been following him. I stated in the former trial of this case I was looking at him at the time he stopped and he was 50 or 75 yards away when

he did stop. I had been watching his car all the time. That is true, I had been watching the car all the way. I saw the car just as it stopped. It was 50 or 75 yards from me when I drove into that light. I think I stated on the former trial of this case I had my eyes on the car at the time it stopped and it was 50 or 75 yards from the car at the time it did stop.

" * * * Q. If you saw him 50 or 75 yards before the collision occurred, there wasn't anything to stop you after that time, is that your answer? A. I might before that —no sir, I was watching. After I saw the car stopped, there wasn't anything to obstruct my view.

" * * * I judge the lights on that car that I was driving were shedding their light 75 yards, something like 75 yards. My lights were reflected on the back of this car at the time, and I could see Mr. Cotten's car at that distance. When I saw Mr. Cotten's car stopped a distance of 50 or 75 yards before the collision took place, the car that Mr. Cotten stopped for to pass the truck must have been 75 yards the other side of this truck, that is it must have been 75 yards on in the direction of Orange from Mr. Cotten's car at that time. It would not have been safe for Mr. Cotten to have attempted to go around the car ahead of him on account of that approaching car. * * * At the time I was trailing the car of Mr. Cotten he had a red tail light on his car. It was just a park light. That was shining at the time I struck him."

From this testimony of Mr. Norris it appears clearly that he was driving closely behind appellee's car, that appellee's car was in the range of the bus lights when it stopped, and that he saw appellee's car stop. Thus, it appears conclusively that none of the matters submitted by these requested issues could have been the sole proximate cause of the collision and, if appellee was negligent in any of the respects charged against him, such negligence was not a proximate cause of the collision and, therefore, not an act of contributory negligence.

Issue No. 12 was as follows: "Do you find from a preponderance of the evidence that the plaintiff, E. E. Cotten, at the time and place of the collision, did not have his car properly lighted at the front and rear?" Appellant challenges this issue as being duplicitous, in that it submitted in one question the inquiry as to the lights on the front and the rear of appellee's car. Under all the evidence, appellee had a tail-light on his automobile and it was burning at the time of the accident. There is some testimony to the effect that he did not have a stop light, but no testimony that he did not have a tail-light; in fact, as shown by the testimony of Mr. Norris, he admitted that appellee had a tail-light and that it was burning. If there is any testi-

mony to the effect that appellee did not have a tail-light, it was only of a negative nature, and could have no probative force against the testimony of the driver himself. Also, it should be said that this issue was immaterial in that Mr. Norris had appellee's car in full view at all times and the presence of lights on the car would not have given him any information he did not have.

We overrule appellant's assignments against the court's definition of unavoidable accident, which was taken literally from the definition given in Stedman Fruit Co. v. Smith, 28 S.W.(2d) 622, and there approved in an opinion by Mr. Chief Justice Hightower of this court.

■ Appellant challenges the jury's verdict, assessing damages for nurse hire, incurred by appellant for his wife, on the grounds: (a) It was without a scintilla of evidence in its support; (b) appellee, who testified on this issue, was not a qualified witness. These objections are overruled. The girl employed by appellee to wait upon his wife was about twenty years old; there was no testimony that she was a trained nurse or that her services were technical or professional. On the contrary, the testimony was that she lived in the house with appellee and his wife and waited upon appellee's wife, performing the necessary services in caring for her. On this issue appellee testified:

"I have someone to stay with my wife, a nurse. It is necessary for me to keep a nurse there all the time. I have had a nurse there ever since my wife was injured. I pay her about $5.00 a week and feed and clothe her, room and board. It would be pretty hard for a fellow to estimate how much that would be per month. Including the amount I pay her and board and lodging, I imagine it would be somewhere around, expense would be somewhere around $40 or $50. Of my own personal knowledge, I know it would be somewhere around $40 or $50, a month."

"The nursing charge I heretofore mentioned, that is a reasonable charge for that service."

"Miss Fontenot is about twenty. Her father and mother are dead. She is making her home there with us. I take care of her and give her money when she needs it. She costs me around $50.00 a month to keep her. I feed and clothe her. I give her a salary."

Mrs. Ether Cotten testified as follows: "I have a girl waiting on me in the home. We take care of her board and room and pay her. It amounts to about $50.00 a month. That is a reasonable charge for those services." City of Dallas v. Moore, 32 Tex. Civ. App. 230, 74 S. W. 95; Dallas Consolidated Electric St. R. Co. v. Carroll (Tex. Civ. App.) 152 S. W. 1165.

■ The submission to the jury of the issue of damage to appellee's car was excepted to on the ground that there was not a scintilla of evidence in the record as to the fair and reasonable market value of the car immediately before the collision in question. This objection is overruled. The testimony of Mr. C. A. Garrett on this issue was as follows:

"My name is C. A. Garrett. I live in Orange, 704 Fourth Street. My business is Ford salesman. I have been engaged in that line of employment six years. I had occasion to examine an automobile owned by Mr. E. E. Cotten about the 9th day of November, 1929. I knew that car prior to that time. At the time I had occasion to examine the car on or about the date I have just mentioned, it had been in a collision. I was acquainted with the market value of second-hand Ford cars at that time. This was a sport coupe. I was acquainted with that value in the vicinity of Orange. I had had occasion to sell second-hand Ford automobiles prior to that time and at the time and since then. I know the cash market value of that car owned by Mr. Cotten immediately before the collision occurred and in the vicinity of Orange."

"At the time I last saw that car before the collision occurred, the actual selling price of that car was $500.00. I had occasion to inspect that car immediately after the collision occurred. I offered him $275.00. That was the actual cash market value of it at that time."

"I couldn't say the value I estimated on the car as $500 was three weeks before the collision. It was no longer than a week."

The point appellant makes is that an examination of the car a week before the collision cannot afford a basis for estimating its value at the time of the collision. For the week following the examination of the car by Mr. Garrett there was no evidence that it was abused. In fact, Mr. Cotten testified that he had driven it up to Saratoga, in Hardin county, a distance of about sixty-five miles, and was driving it home, and there was no evidence of the least abuse of the car other than would follow from its ordinary use. 5 Tex. Jur. 649; 13 Tex. Jur. 415; Hartford Fire Ins. Co. v. Ry. Co. (Tex. Com. App.) 239 S. W. 919, support this ruling.

■ The verdict in favor of appellee for the damages suffered by his wife is challenged on the following grounds: (a) It is excessive; (b) there was no evidence in the record as to the value of the wife's services to appellant, nor was there any allegation of the life expectancy of the appellee, nor was there any allegation of the life expectancy of the wife or the value of the wife's services; (c) there was no pleading or proof as to the amount Mrs. Cotten could have earned during the remainder of her life, nor as to the length of time she would have been able to earn wages, nor was there any pleading or proof as to the val-

ue of her services to appellee had she not been injured. These exceptions are all overruled. There was no special exception challenging the sufficiency of appellee's petition in the respects assigned. In its statement under these propositions, appellant does not quote from the pleadings in support of its assignment of their insufficiency. An examination of appellee's trial petition shows that he pleaded his damages generally, and the facts upon which his claim was based. If appellant desired a more specific pleading, the defects in the pleading should have been called to the trial court's attention by special demurrrers. It was not necessary that appellee prove specially the value of the services of his wife, as this is a matter of common knowledge; the value of the wife's labor does not admit of direct proof. 13 Tex. Jur. 402. The testimony was that appellee was thirty-eight years old and his wife thirty-six years old at the time of the collision. Given their ages, their life expectancy was a matter of judicial knowledge. Appellee testified as follows as to the extent of his wife's injuries and the expense occasioned thereby:

"I stated we carried my wife to the hospital. I saw her after she arrived at the hospital. She was vomiting. * * * Since this collision occurred, my wife has been an invalid, and I don't know, just everything wrong, looked like, with her, invalid —can't eat, can't sleep, can't sleep, can't rest; can't do anything only just suffer all the time. She remains in the bed all the time. She is under the care of doctors all the time. I know how much she weighed at the time this collision occurred. It was 137½ pounds. I would judge she weighs now somewhere around seventy or seventy-five pounds, maybe more, maybe not so much. I could not tell you exactly. She has to lay on a cot with twelve inch boards under the bed, where there will be no springs, don't you see, and she has to stay propped up on this bed all the time. She can't lay on her side, just has to lay right on her back all the time. She suffers with her head and shoulders and down her spine. Her right limb is paralyzed from here down, no feeling whatever. She can't move it, and the doctors can't find no feeling in this right leg here, along here from down there. That is from 'here' about the waist, on to the bottom of her foot. She is not able to go or move from place to place by herself. She can't get out of bed at all. She couldn't get out of the bed if it was afire. She would just have to stay there, that is all. She can't use herself, she couldn't walk, and she couldn't crawl. If she was to fall off the cot, she couldn't crawl off. If it is necessary to move her from place to place, I carry her in my arms like she is a baby, and when I am not in the house the girl carries her.

"I have someone to stay with my wife, a nurse. It is necessary for me to keep a nurse there all the time. I have had a nurse there ever since my wife was injured. I pay her about $5.00 a week and feed and clothe her, room and board. It would be pretty hard for a fellow to estimate how much that would be per month. Including the amount I pay her and board and lodging, I imagine it would be somewhere around, expense would be somewhere around $40 or $50. Of my own personal knowledge, I know it would be somewhere around $40 or $50 a month. My wife was in good health immediately before this collision occurred, before she received these injuries. She was able to do her household work prior to that time. She did do it. Prior to the time my wife was injured, she cooked and she washed and she kept boarders and milked cows, and just anything that there was to do around the place, and used to, when we lived on the farm, she helped me just anything there was to do on the farm, she would do it, picked cotton, chop cotton, or anything like that, she helped, and since I have been working around oil fields and sulphur fields, she has been keeping boarders and doing her household work. I have had doctors attend my wife since she was injured.

"They have given her (meaning doctors), I reckon, everything there was to give her. They have given her medicine to make her sleep. They tried that a while, and they quit it. It did not have any result and they did not give it to her. My wife used to get an hour's sleep at night, about an hour, but now maybe it is seventy hours before she sleeps a bit, and maybe it is fifteen or twenty minutes, maybe thirty minutes, maybe not so long. She has got dark circles around her eyes here. They come from around here down on her cheek bone like, big around both eyes. They are beneath her eyes. They don't go above no further than the eyes, something like that. My wife is not able to retain food. She can't eat anything. She can't sleep, she can't drink nothing hardly, everything she eats or drinks swells and bloats her in the stomach and makes her sick all in the stomach, she vomits and it shortens her breath."

"I stated that I have had some four or five doctors attend my wife. * * * I have paid some of them and some I haven't paid. The amount of money I have paid to these doctors for attending my wife, since she received these injuries, and as a direct result of the injuries, besides what I owe, would be hard for a fellow to get to, unless he kept right up to it, but I figure around $1500 or $2000. I think what I have paid the doctors and what I am due them now is somewhere around there, it cost me Mr. Stephenson. I think I owe these doctors now somewhere around $1800 or $1900, here in Orange, and

I owe that one in Louisiana some. I don't know just how much. I will have to find out about that and I owe Dr. Bell in Liberty. I don't know what his bill is, and I don't know exactly what Dr. Barker's bill is at Thibodeaux."

"I testified in this case yesterday. I have determined the amount of money that I have paid out on account of the injuries received by my wife in this collision. It is approximately about $850.00. That is the amount I have paid out in money. I have incurred some bills which have not been paid. I have become liable and bound to pay obligations that I have incurred on account of the injuries received by my wife, for medical purposes, doctor's visits and such like. It is about $1375, something like that. That is medical services rendered by doctors for my wife. That is a reasonable charge for that service. I have incurred obligations for medical treatment for my wife on account of the injuries she received in the collision mentioned in plaintiff's petition. I am acquainted with the amount due. I know of my own knowledge the amount of the obligations. I owe Dr. Barker $200.00."

" * * * I know one thing, I was making and saving $200. a month and I aint saved a dime since, spent all I had. I had been saving $200 a month something like a year, hardly so long. I had saved up something like $2400 in cash. Take all my expenses, what this called for, it taken all I had and all I could make since then."

Mrs. Ether Cotten testified as follows:

"My age is thirty-seven the first of November. I have been married seventeen years. E. E. Cotten is my husband. I have one child. That is a girl. * * * At the time I was married I was in absolutely good health. * * * I was able to do my household work at that time. I was able to do my household duties and also I worked in the field. That was when we were farming, I picked cotton, chopped cotton, thinned corn. I had duties around home. I milked my cows and did my washing and ironing. I moved from there to Saratoga, Texas. I did my household work while I was living at Saratoga, Texas. * * * I kept boarders. At times I kept from six, eight, ten, twelve, something like that. I did the cooking. I did my washing, ironing, and all my household work. I milked my cows. * * * We then moved to Rosenberg, and from there we went to Boling, Texas. * * * I had the measles at Boling. That is all the sickness I had there. I never did suffer with any other character of ailment or disease other than having the measles."

"Since this collision took place, I have just suffered death. I haven't had a moment's ease since I was hurt, from my head plumb down. My head, my back, my left limb, the ankle, the knee, and hip, my shoulders, and I haven't had a moment's rest since I was hurt. I suffer death all the time. I haven't had a moment's ease, can't sleep, can't eat, and can't rest, can't turn over, can't get over on the left side or right side, can't raise up, just like you see me lying is the way I have to lie all the time, can't lie down, can't get any lower than you see me now. My right limb is perfectly dead, doesn't have any feeling at all from the short ribs down, just half down, I am not able to go from place to place by myself. I am not able to get up from the position in which I am compelled to remain. When they move me, they carry me in their arms, just like you would carry a baby. My husband carried me in his arms, just like you would carry a baby. I recall how much I weighed at the time this collision occurred. I weighed 137½ pounds at the time. My health was good at that time. I had never had any serious sickness or ailment prior to that time, except the measles. I had never suffered from spinal meningitis. I had never had pellagra or any kind of disease like that. It is necessary for me to have a nurse or someone in the home to take care of me. That has been necessary ever since I was hurt. Before I was married to Mr. Cotten and up until my marriage, the condition of my health was good. I don't have any rest at all. I am compelled to lie in the position I now occupy. I have to lay just like you see me here, on my back, lie flat like this, can't lower myself. I have to lay on a cot with twelve-inch boards, can't lay on a spring, have to lay on a twelve-inch board on a cot with a mattress. The position I am now assuming is almost a sitting position. That is just the way I stay all the time. I was brought into the court room today in an ambulance. I never told anyone that I had suffered from meningitis. I never did suffer with any of the pains that I am now suffering from before I received these injuries in the collision. My hearing is not as good as it was. It has been impaired. I can't see to read, can't see to write or sew or anything like that. I can just see big headlines on anything and it makes me sick, sick, sick. Everything I look at close to me, it makes me deathly sick. I did not suffer from any of these conditions previous to this collision. I have a girl waiting on me in the home. We take care of her board and room and pay her. It amounts to about $50.00 a month. That is a reasonable charge for those services. This nurse lives in the home with me and my husband and daughter. * * * I recognize this picture. That is a picture of myself. That was taken two weeks before I was hurt. * * * I weighed 137½ when this picture was taken. I don't know what my present weight is. It is estimated between seventy and sev-

enty-five pounds. That is my daughter present there with me."

Dr. C. J. Barker, appellee's family physician, testified that he had had Mrs. Cotten under his care. "She is very much emaciated; she would weigh about eighty pounds; she doesn't sleep well; she is suffering from paralysis of her right leg. She is unable to move at all; it's insensible to heat; she can't move it. There is some discoloration to her eyes. * * * From my examination of Mrs. Cotten, and from the history of her case as related to me by her, in my opinion it looks like the cause of her present condition is some injury. It would look like Mrs. Cotten is permanently, totally disabled from the length of time she has been in that condition."

Dr. J. E. Bell testified that he knew Mrs. Cotten about four years ago and began treating her about six weeks ago. She had lost about thirty or forty pounds in weight since he first saw her. "She has a wasting of the right leg and flaccid paralysis of the right leg, loss of sensation in the entire leg from the foot up to the crest of alignment, she has alternate periods in which the abdomen distends, gas and bloats up until she is immense in size, then this goes down and she is hardly ever—bowels hardly ever move, she will go sometimes a week, almost paralysis of the bowels. She is in a very nervous condition, she says she doesn't sleep hardly any at all * * * and she is continually in pain. * * * From my examination of Mrs. Cotten and from the history of her case as related to me by her, I think no doubt the injury resulted in the paralysis of the leg. From my examination of Mrs. Cotten and from the history of the case as she related it to me, I think there is no question but that she is permanently, totally disabled."

The testimony of these two doctors was in all things corroborated by Dr. F. W. Lawson and Dr. Wiley O. Jones. Dr. L. O. Thompson, a witness for defendant, testified: "I would not undertake to tell the jury that the injuries of Mrs. Cotten, received in this collision, are not the cause of her present condition. * * * In my examination and in my care I found evidence of traumatism which might produce paralysis."

Appellant asked Dr. H. E. Giddings, who was testifying by deposition, the following question: "If it be true that several years prior to the illness for which you treated Mrs. Cotten she had suffered a severe attack of spinal meningitis and had suffered an attack of pellagra, which caused serious damages, and if it be true that during March, 1929, she suffered a rather serious attack of measles, and during that attack she at times suffered a paralytic condition of the body, losing control of her body and suffering stiffness of the limbs, and if she suffered those condi-

tions when she was sick with meningitis, then, doctor, in your opinion is she liable to have a return of those paralytic conditions even without suffering any traumatism? A. (Not allowed) Yes it's possible."

H. E. Giddings, deposition taken October 7, 1930:

"To Direct Int. 14:

"Mr. Stephenson: We object to it, leading. Based upon assumption he has knowledge of certain facts.

"The Court: Sustain the objection.

"Mr. Barnes: We except."

Appellant's hypothetical question was based upon the testimony of Mrs. A. B. Gladney that she knew Mrs. Cotton and at one time helped nurse her through an attack of measles, and that Mrs. Cotten told her that at one time while living in Polk county she had had an attack of spinal meningitis and would have "kinda stiff spells and she wouldn't be able to raise her head off the pillow. Mrs. Cotten mentioned having pellagra during the time when I knew her." Mrs. O. E. Stevens testified: "Mrs. Cotten told me that she had spinal meningitis once before she came here— she was not always in control of her body and limbs during that illness, she would lie there lifeless for about a week that I know positive of. * * * Mrs. Cotten did not mention her condition when she had meningitis as compared to a condition when she was suffering with measles when I knew her." We do not think this testimony formed a predicate for the question asked Dr. Giddings, in that it was not shown that the conditions, suffered by Mrs. Cotten prior to the collision and referred to in the question as "those paralytic conditions," were similar to the condition following the collision. But if improperly excluded, this ruling should not constitute reversible error. Appellant correctly asserts that whether or not this ruling was harmful depends upon the full consideration of the whole record. On the issue suggested by this question and answer appellant offered the following expert testimony: "In my opinion I should not think the paralysis of a party suffering a traumatism would be due to the traumatism if the party involved in the traumatism should have been taken into a hospital immediately after the traumatism was suffered and had been under the care and observation of a competent physician for a period of approximately two days, and during that time he found no fractures, no evidence of severe contusions and discharged her at the end of that time because he found no evidence of any injury which would necessitate his further treating her or keeping her in the hospital, and then after a period of three or four months she develops paralysis. I should not think the paralysis would be due to that traumatism after having gone that long without showing symptoms."

Then Dr. Pearce, in concluding his testimony, said: "If there is nothing there to suggest traumatism to any parts, I shouldn't think that the injury had anything to do with a paralysis that might show up four or five months later on. When I went to see her, I told her would like to have her at the hospital a day or two so that we could get some tests made. It could be possible that that paralytic condition that did develop in the following March might be due to an acute attack of nephritis or Bright's disease."

Dr. L. O. Thompson of Orange, Tex., in estimating the merits of this claim, said: " * * * There was no evidence of any paralysis' at the time I saw her last. I saw her last at the hospital. I was satisfied to have this lady leave the hospital. I did not think at that time she needed any further hospitalization or treatment from me. I saw her after she suffered the paralysis in the limb. At that time I made a request for a laboratory test and further examination. I did not get that permission given to me."

Dr. H. E. Giddings, testifying by deposition, said: "I found Mrs. Cotten in a stupefied and highly nervous state upon my first visit. At that time I called in additional medical help, Dr. Toxie Davison. That case at that time was in such a state as to make me recommend and secure a nurse * * * Mrs. Cotten was suffering from measles at that time. It was a rather severe attack of that disease. * * * In giving me her history as to prior sickness and disease, she mentioned some nervous disease, I do not know the nature of it, that she had some time before."

Then Dr. Giddings, in a letter dated May 3, 1930, written to Mr. Stevenson, appellee's counsel, testified in this language: "When I was called to see her March 11, 1929, she was quite nervous. She was suffering with a very high fever and lay in a stupefied condition. * * * During the attack of measles Mrs. Cotten was in a highly nervous state, simulating an attack of paralysis."

In view of this testimony by recognized experts, it should be said that, if the exclusion of the answer, "yes, it's possible," to the hypothetical question was error, the error was harmless.

There is no merit in the contention that appellee failed to allege facts showing that the driver of the bus, J. T. Norris, at the time and place in question, was actually engaged in the course of appellant's employment. That fact was alleged generally and the evidence, admitted without exception, was undisputed that he was the driver of the bus in full charge of it at the time of the collision.

The court improperly refused to sustain appellant's peremptory challenge to the juror Mr. R. E. McKague. This juror testified that he knew appellee, had visited in his home on a number of occasions, was present in the courtroom during a part of the previous trial of this case, and heard argument of counsel on the previous trial. But appellant's exceptions to this ruling of the court does not show injury, that is, having exhausted one of his peremptory challenges on the juror R. E. McKague, the record does not show that he was compelled to accept an objectionable juror. Galveston, H. & S. A. Railway Co. v. Thornsberry (Tex. Sup.) 17 S. W. 521; International & G. N. Railway Co. v. Owens, 58 Tex. Civ. App. 177, 124 S. W. 210; Russell v. Bailey (Tex. Civ. App.) 290 S. W. 1108; 3 Tex. Jur. 487.

As stated above, Dr. H. E. Giddings testified for appellant by depositions. Appellee read to the jury the cross-interrogatory: "Do you do any medical work for insurance companies or for corporations in any respect?" The answer was: "Yes, the Texas-Gulf Sulphur Company." Objection was urged against this question that it "was prejudicial and inflammatory, in that it injected the idea of an insurance company's protecting the defendant into the minds of the jury." There was no merit in this objection. The question and answer were admissible on cross-examination for the purpose of affecting the credibility of Dr. Giddings, and also to show bias or interest on his part. Wentworth v. Crawford, 11 Tex. 127; Missouri, K. & T. Ry. Co. v. Calnon, 20 Tex. Civ. App. 697, 50 S. W. 422; Shumard v. Johnson, 66 Tex. 70, 17 S. W. 398; Jimmie Guest Motor Co. v. Olcott (Tex. Civ. App.) 26 S.W.(2d) 373, 375. Also, as appellant was operating its bus under the provisions of our general statutes, requiring it to carry liability insurance, the admission of the question was without prejudice because the jury was presumed to know this fact. Monzingo v. Jones (Tex. Civ. App.) 34 S.W.(2d) 662.

Appellant duly excepted to the following argument made to the jury by Hon. Martin Dies, counsel for appellee: "Mr. Barnes was present at the taking of these depositions, or most of them," and "I know the corporation has got the advantage. They have got the money. They can go all over the State of Texas and bring their witnesses here." We agree with appellant, on authority of Floyd v. Fidelity Union Casualty Co. (Tex. Com. App.) 39 S.W.(2d) 1091, that if this argument was improper it constitutes reversible error if, under all the circumstances, there is any reasonable doubt of its harmful effect, or unless it affirmatively appears no prejudice resulted. Mr. Barnes, referred to in the argument, was counsel for appellant on the trial of this case. This argument was excepted to at the time it was made, and on appellant's request the court charged the jury to disregard it; but in submitting the charge the court failed to call the jury's attention to the statement, "I know the corporation has got

the advantage." As appellant failed to call the court's attention to this omission in the charge, the entire argument must stand as covered by the charge.

While there was no evidence that Mr. Barnes was present when the depositions were taken, two of his witnesses, one living in Jefferson county and one in Orange county, testified that he interviewed them before the trial and took written statements from them. Of course, he had the right to do that, and also he had the legal right to be present when the depositions of his witnesses were taken. To say that he was present at the taking of the depositions did not charge him with doing an illegal act, and was no more inflammatory than the admitted fact he interviewed certain of his witnesses and took statements from them. It is improbable that the statement that Mr. Barnes was present when the depositions were taken could have had any influence whatever on the jury. But if it was objectionable, the court's charge relieved it of error.

The second part of the argument had some support in the facts. Many of appellant's witnesses were nonresidents of Orange county, one living in San Antonio, Tex., one or more in Jefferson county, Tex., one or more at Bolling, Tex., one at Houston, Tex., and one or more at New Gulf, Tex. These witnesses testified that before the trial they were visited by one of appellant's representatives and each of them gave this representative a written statement of what he knew about the case. After making these statements, the depositions of most of them were taken and read on the trial. But at least two of the nonresident witnesses were present in court and testified from the witness stand. The record also showed that immediately after the accident the names of the passengers and their places of residence were taken by one of appellant's agents and at that time statements were taken from some of the witnesses. These facts afforded a reasonable basis for the statement that appellant was able to go all over the state and bring its witnesses to court. From this fact the conclusion logically followed that appellant "had the money." While the proof of the investigation made by appellant in the preparation of its case for trial may not have justified the argument "I know the corporation has got the advantage," we do not think this statement was so inflammatory, in view of the attending circumstances, that its evil effects, if any, were not eradicated by the court's charge. Discussing a similar argument in Davis, Agent, v. Hill (Tex. Com. App.) 298 S. W., 526, 527, it was said: "Where a matter is improperly before the jury, ordinarily, a ruling by the court to that effect, and especially an instruction not to consider the same, will be held to cure

the error. * * * The court's instruction to the jury not to consider the same must be held to have relieved the case of any probable error. Jurors must be presumed to have obeyed the instructions of the court, so far as they were capable, and the language complained of is not of that inflammatory character, and is not of that evidentiary nature as to preclude the conclusion that the jury did obey the court's instruction, or even to make the matter at all doubtful."

Believing the case was properly tried in the court below, the judgment appealed from is in all things affirmed.